## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DAVID CIEMPA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 08-CV-0685-CVE-TLW** |
| | ) | |
| **JUSTIN JONES, WALTER DINWIDDIE,** | ) | |
| **DEBBIE L. MORTON, AL BLAIR, DICK** | ) | |
| **BARTLEY, KAMERON HARVANEK, G.** | ) | |
| **MCCLARY, CURTIS HOOD, JAMES** | ) | |
| **CAVE, RICK BOYETT, JOHN DOE sued as** | ) | |
| **"Unknown Employee," CHRIS REDEAGLE,** | ) | |
| **LEO BROWN,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Now before the Court are Defendants' Motion to Dismiss Plaintiff's 42 U.S.C. § 1983 Civil Rights Complaint or Alternatively Motion for Summary Judgment and Brief in Support (Dkt. # 42), Plaintiff's Motion to Reassert his Motion for Preliminary Injunction (Dkt. # 53), Plaintiff's Motion to Supplement his Response to Defendants' Motion for Summary Judgment (Dkt. # 56), plaintiff's letter request to supplement the record (Dkt. # 57), and Plaintiff's Second Motion to Supplement his Response to Defendants' Motion for Summary Judgment (Dkt. # 58).  David Ciempa, currently incarcerated in the Oklahoma prison system and appearing pro se, alleges that defendants violated his rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc et seq. (RLUIPA), by preventing him from receiving certain religious reading materials, denying him

space and time in the prison chapel, denying his request for a Halal diet, and denying his request to purchase pork-free hygienic products from the prison canteen.

## I.

Ciempa is currently incarcerated with the Oklahoma Department of Corrections (ODOC).[1] From July 13, 2006 to July 10, 2008, he was housed at the Dick Conner Correctional Center (DCCC).  On July 10, 2008, he was transferred to the Jess Dunn Correctional Center (JDCC).  On July 24, 2009, he was transferred back to DCCC.  Dkt. # 43-2, at 1-2.  Defendant Justin Jones is (or was, at the relevant times) the Director of ODOC.  Dkt. # 18, at 1.  Defendant Walter Dinwiddie was, at the relevant times, the DCCC warden.[2]  Id.  Defendant Debbie Morton is (or was, at the relevant times) a DCCC "Director's Designee."[3]  Id. at 2.  Defendant Al Blair is (or was, at the relevant times) a DCCC Warden's Assistant.  Id.; Dkt. # 42, at 20.  Defendant Dick Bartley is (or was, at the relevant times) the DCCC Mail Room Supervisor.  Dkt. # 18, at 1; Dkt. # 43, at 20.  Defendant Kameron Harvanek is (or was, at the relevant times) the DCCC Acting Warden.  Dkt. # 18, at 1; Dkt. # 43, at 20.  Defendant Gary McClary[4] is (or was, at the relevant times) a Security Personnel Sergeant at DCCC.  Dkt. # 18, at 1; Dkt. # 43, at 20.  Defendant Curtis Hood is (or was, at the relevant times) the DCCC Chief of Security.  Dkt. # 18, at 1; Dkt. # 43, at 16.  Defendant James Cave is (or was, at the relevant times) a DCCC Procedures Officer.  Dkt. # 18, at 1; Dkt. #

---

[1]     Ciempa is serving four concurrent twenty-eight year sentences for convictions of attempted robbery with a firearm, assault and battery with a deadly weapon, and two counts of possession of a firearm.  Dkt. # 43-2, at 2.

[2]     Greg Province has been the DCCC warden since April 1, 2008.  Dkt. # 43, at 28.

[3]     Morton's duties include review of grievance forms for compliance with technical requirements.  Dkt. ## 43-2, at 27; 43-8, at 26.

[4]     Ciempa mis-spelled defendant McClary's name.

42, at 20.  Defendant Rick Boyett is (or was, at the relevant times) DCCC Acting Deputy Warden, Administration.  Dkt. # 18, at 1; Dkt. # 43, at 20.  Defendant Doe is DCCC Deputy Warden, Administration.  Id.  Defendant Chris Redeagle is (or was, at the relevant times) the DCCC Acting Deputy Warden.  Id. at 3.  Defendant Leo Brown is (or was, at the relevant times) the ODOC Agency Chaplain.  Dkt. # 43-10, at 2-3.

A.      The Five Percent Nation, or the Nation of Gods and Earths

Ciempa describes himself as a "strict adherent of the teachings of Clarence 13X Smith, a.k.a Father Allah . . ., founder of the Five Percent . . . Nation, a.k.a. The Nation of Gods and Earths [(NGE)]. . . ."[5] Dkt. # 18, at 3.  He describes the NGE as "a God-centered Culture."  Id. at 11.  An NGE Office of Cultural Affairs publication describes the NGE as "a culture free from but equivalent to any mainstream religion."  Dkt. # 52, Ex. N, at 5.[6]  The NGE "traces its roots to the Black Muslim movement that emerged in the midtwentieth century and most [directly] to the Nation of Islam . . . with which the NGE shares some teaching and its central text . . . ."  Dkt. # 53, at 2.  The NGE's central text is known as the 120°.  Id.

_____

[5]     For a more complete description of the NGE's history and activities outside prisons, see Marria v. Broaddus, No. 97 Civ. 8297 NRB, 2003 WL 21782633 (S.D.N.Y. July 31, 2003) (holding that a complete ban on NGE literature violated RLUIPA).  The NGE has been designated as a prison security threat group in Michigan, Johnson v. Stewart, No. 1:07-CV-77, 2008 WL 828086 (W.D. Mich. March 26, 2008), New Jersey, Fraise v. Terhune, 283 F.3d 506 (3rd Cir. 2002), North Carolina, Cooper v. Starling, No. 5:02-CT-250-BO, 2003 WL 23350443 (E.D.N.C. Jan. 8, 2003), South Carolina, In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464 (4th Cir. 1999), and Virginia, Cartwright v. Meade, No. 7:08-CV-00250, 2008 WL 2944668 (W.D. Va. July 31, 2008).

[6]     The documents attached to several of Ciempa's pleadings were not imaged and are not available on the CM/ECF system.  Paper copies are available for review at the Court Clerk's office.

3

B.      ODOC Mail Policy

ODOC has promulgated guidelines relating to correspondence, publications, and audio/video

media.   OP-030117 states, in relevant part:

> Publications are prohibited that . . . Advocate terrorism, criminal behavior, racial,
> religious, or national hatred, or any material that creates an unsafe environment for
> the inmates or staff. . . . The facility is not authorized to implement a prohibition on
> any materials that inmates may receive by subscription, such as a magazine,
> newspaper, or other similar type of periodical. Each issue of the material has to be
> received and reviewed to determine whether or not it violates the correspondence
> restrictions of this agency. . . . Correspondence containing gang related material,
> information, photographs, or symbols are prohibited.

Dkt. # 42-4, at 3-5.

The guidelines require ODOC facilities to designate an employee or group of employees to

review materials coming into the facility.  Facility heads or their designees and prison employees

who review incoming material are required to undergo yearly training in the review, recognition,

and disposal of contraband material.  Id. at 4.  Inmates are notified of receipt of prohibited material

using a prohibited correspondence notification form.  Id.  They are given the option of "either having

the issue returned to the sender or sent home at the inmate's expense, or having the material

destroyed."  Id.  Outgoing non-privileged mail is also subject to inspection.  "Mail violating

correspondence guidelines will be returned to the inmate with an explanation of the violation unless

it is used as evidence in a court/administrative hearing.  The inmate may also be placed on the

restricted correspondence list and/or subject to disciplinary action."  Id. at 6-7.


C.      ODOC Grievance Procedures

4

ODOC has promulgated a procedure, OP-090124, for offender grievances.[7] First, an offender must try to resolve his or her complaint informally. If not resolved informally, he or she must submit a Request to Staff (RTS) form to the appropriate staff member. If the complaint is not resolved, then the offender may submit a formal grievance, using the Offender Grievance Report Form (GRF). The GRF is reviewed and a Grievance Response from Reviewing Authority is issued. An inmate may appeal the grievance response upon specified grounds only. The administrative review authority or chief medical officer, as appropriate, performs the final review of an appeal. Such review is ODOC's final ruling.

D.    The Five Percenter Newspaper

Ciempa states that he ordered a one-year subscription to <u>The Five Percenter</u> newspaper in the spring of 2006. Dkt. # 18, at 3. The newspaper is "a central link and mechanism of communication with members of the Five Percenter community outside prison . . . ." <u>Id.</u> at 5. He states that he received four or five copies until November 2006, at which time Volume 12.3 was prohibited. Defendant Bartley, the DCCC Mailroom Customer Service Representative states that Volume 12.3 was the first issue of <u>The Five Percenter</u> received at the DCCC mailroom since he began working there in August 2003. Dkt. # 43-3, at 32. Bartley believed that Volume 12.3 contained racist material and sent it before the DCCC Literary Review Committee (LRC) on November 16, 2006. <u>Id.</u> The same day, the LRC determined that "the five percenter newspaper is

---

[7]    OP-090124 is not in the record on summary judgment. However, the Court may take judicial notice of its existence. <u>See</u> Fed. R. Evid. 201(b); <u>Ray v. Aztec Well Svc. Co.</u>, 748 F.2d 888, 889 (10th Cir. 1984) (noting that the court could take judicial notice of agency rules and regulations). Further, the Tenth Circuit provided a similar description of ODOC grievance procedures in <u>Thomas v. Parker</u>, Nos. 09-6203, 09-6204 , 2010 WL 2510653, at *2 (10th Cir. June 23, 2010).

a raceist [sic] publication that advocates segregation hate and the overthrow of the 'whiteman,'" and recommended that the issue be prohibited.  Id. at 35.  On November 17, 2006, Ciempa received a prohibited correspondence notification, which stated that The Five Percenter was denied because it was a "raceist [sic] publication."  Id. at 37.  There is no evidence in the record that Ciempa filed a GRF regarding Volume 12.3.

An article titled "Your Prison & Institution Reporter" in Volume 12.3 states, "[t]o be perfectly clear the Blackman is God and the whiteman is the devil. . . . in these prisons they lie, cheat, steal and try to master the original man using time as a weapon.  From the principal enforcers to the policymakers the devil is doing his best to use our people as tools and also as a slave."  Another article states, "[e]ven the bible says the Whiteman was made and was evil in nature," and "[s]o it is clear from the beginning or genesis the whiteman has been the evil that lives, the devil in the flesh."  Dkt. # 43-3, Attachment 11.

On January 30, 2007, Ciempa filed an RTS with the LRC protesting the prohibition of The Five Percenter.  Dkt. # 43-2, at 10.  Defendant Blair responded, "this issue has already been answered the Five Percenter will not be allowed."  Id. at 10.  On February 2, 2007, Ciempa filed GRF No. 07-295, stating that "on or about 1/25/07, I was notified by the Literary Review Committee that I was prohibited from receiving the Five Percenter newspaper . . . ."  Id. at 8.  The reviewing authority denied Ciempa's grievance on February 15, 2007, stating:

> OP-030117 states "Correspondence is prohibited that advocates terrorism, criminal behavior, racial, religious, or national hatred, or any material that crqtes [sic] an unsafe environment for the inmates or staff.["] The Five Percenter Newspaper that was reviewed advocates all of the abave [sic].  Each publication will be reviewed separately on its contents, this is not a blanket ban on all publications of the five percenter newspaper just the one reviewed.  Relief Denied.

Id. at 11.  Ciempa appealed.  Id.  His appeal was denied because "there has been nothing offered by [Ciempa] to the Director which indicates the reviewing authority's response is not proper."  Id. at 13.  Ciempa received another prohibited correspondence notification regarding The Five Percenter on May 15, 2007.  Dkt. # 1, at 23.  There is no evidence that Ciempa filed a GRF regarding this denial.  There is no evidence of an issue of The Five Percenter being denied between May 15, 2007 and January 2009.

On January 25, 2009 (while at JDCC), Ciempa filed GRF No. JDG09-04 stating, "My Jan. copy of the Five Percenter was confiscated by security."  Dkt. # 43-8, at 42.  The grievance response from reviewing authority states "your newspaper from [sic] The Five Percenter was reviewed to ensure it met the guidelines stated in [OP-030117].  Your newspaper has been sent to JDCC post office personnel to be forwarded to you.  Relief granted."  Id. at 40.

On August 1, 2009 (after Ciempa returned to DCCC), Ciempa sent an RTS to Butler in the DCCC mailroom stating, "upon arrival at DCCC, I did not find any copies of my The Five Percenter newspaper, namely May and June issues.  I recently received my July issue."  Dkt. # 53, Ex. B.  On August 20, 2009, Ciempa was notified that Vols. 14.12 and 14.9 of The Five Percenter had been forwarded to the LRC.  Id., Ex. C.  The LRC recommended that Volume 14.9 be prohibited because the issue:

> contains an article describing an organization called, "God Body."  This article goes on to indicate that " Today the Nation of Gods and Earth have mostly accepted "God Body" as their vanguard group used to protect and safeguard the ideology of the NGE . . .".  The article indicates that this group has a hand sign, which is like the peace sign, except the index finger and middle finger are placed together. . . . all subsets of the God Body use this number "7" (or gun) hand sign when saluting one another."  The article indicates that in New York, God Body is part of an alliance called New York G's.  The article indicates that the New York G's wars with any non-native organizations like Bloods, Crips, . . .".  Page(s) 1, 7, 9, 11 of Volume 14.9 displays this gang sign.  DCCC-030117 I.B.9 indicates, "Correspondence containing

7

gang related material, information, photographs, or symbols are prohibited."  As a
result, this committee recommends that this issue of "Five Percenter" be prohibited.

Dkt. # 53, Ex. D, at 1.  The LRC recommended that Volume 14.12 be prohibited because "[p]age

1, 7 of Volume 14.12 contains photos with individuals displaying number '7' (or gun) hand sign,"

and quoted the policy on gang-related correspondence.[8]  Id. at 2.  Ciempa received a prohibited

correspondence form regarding Vols. 14.9 and 14.12, dated August 28, 2009.  Id., Ex. E.  Ciempa

submitted an RTS and GRF No. 09-064, requesting "reconsider[ation of] the LRC's position that

the N.G.E.'s P.E.A.C.E. [or '7'] sign is a gang" sign.  Id., Ex. F, at 4.  Ciempa's grievance and

appeal were denied.  Id., Ex. F, at 1-2.

On November 17, 2009, the LRC recommended that Vol. 15.3 of The Five Percenter be

prohibited because of a "[p]hoto on front page of large group - six instances of gang signs being

thrown with hands[.]" Dkt. # 53, Ex. O, at 1.  Ciempa received a prohibited correspondence form

dated November 19, 2009.  Id. at 2.

On December 8, 2009, the LRC recommended that Vol. 15.4 of The Five Percenter be

allowed.   Dkt. # 52, Ex. P.   Ciempa received Vol. 15.4 and attached it to his Response to

Defendants' Motion for Summary Judgment and Brief in Support (Dkt. # 52).

E.      Correspondence

---

[8]      The Court has independently reviewed Vols. 14.9 and 14.12 and finds that the LRC's
description of the content is accurate.  However, the Court makes no independent
determination that the "7" hand signal is a gang sign.

Ciempa alleges that Bartley, as the Mail Room Supervisor, "interdicted [p]laintiff's personal correspondence addressed to Almighty Divine Justice Allah, G. Kalim, Editor, and/or Allah School in Mecca, requesting copies of 120°, plus lessons, etc., and sending 'builds' or 'add-ons' for publication, to which he never received responses after November of 2006 . . . ." Dkt. # 18, at 5. Terrence Bolt, a Unit Manager at DCCC, reviewed all prohibited correspondence notices from July 13, 2006 to September 17, 2009 and found no evidence that any mail from Ciempa to G. Kalim had been prohibited. Dkt. # 43-4, at 14. Bartley, who was responsible for review of all correspondence processed through the DCCC mailroom from July 13, 2006 through September 17, 2009, is not aware of any prohibition of mail from Ciempa to G. Kalim. Dkt. # 43-3, at 32. Ciempa has provided examples of his NGE-related correspondence with persons other than G. Kalim. This correspondence was sent and received by Ciempa while in ODOC facilities. See Dkt. # 52, Exs. E-J.

F.     Books

Ciempa alleges that two books he ordered were wrongly prohibited, and that another book was erroneously attributed to him. On November 13, 2007, Ciempa ordered three books: The Soldier's Guide, Daidoji Yuzan's Code of the Samurai, and Stoic Warriors; and extra order envelopes from Edward R. Hamilton, Bookseller. Dkt. # 43-2, at 34. Code of the Samurai was out of stock and not shipped. Id.

During the last few months of 2007, a book titled The U.S. Army Ranger Handbook came into DCCC. Defendant Hood, DCCC Chief of Security, does not remember to whom it was addressed or whether it was sent home or destroyed. However, he does remember that the book "was extremely inappropriate for a correctional setting," as it contained military subject matter including combat tactics, demolitions, and booby traps. Dkt. # 43-4, at 16. On December 3, 2007,

the LRC recommended that the U.S. Army Ranger Handbook be prohibited because it was a security threat.  The LRC form attributed the book to Ciempa.[9]  Dkt. # 43-2, at 33.  On December 19, 2007, a prohibited correspondence notification form was sent to Ciempa informing him that The U.S. Army Ranger Handbook had been prohibited.  Id. at 32.

At around the same time, two military-type books that were addressed to Ciempa came into DCCC.  McClary remembers discovering these books, but does not remember their titles.  Ciempa claims that the books were The Soldier's Guide and Stoic Warriors.[10]  McClary had Ciempa come to the Shift Office to discuss the books.  McClary told him that "the books contained obvious violations of the facility's correspondence guidelines and that they would probably be required to be sent home."  Dkt. # 43-4, at 35.  Ciempa and McClary went to the mailroom where Bartley weighed the books in order to let Ciempa know the cost "when or if the books were required to be mailed out."  Id.  There is no record of The Soldier's Guide or Stoic Warriors being reviewed by the LRC or formally prohibited.  Dkt. # 43-4, at 14.

Ciempa filed GRF No. 08-001 on December 27, 2007.  He stated that he did not order the U.S. Army Ranger Handbook, and that he "actually bought (4) books, but one (1) was out of stock.  Thus, I was sent three (3) books about military theory/philosophy/spirit, not combat, booby traps or bombs."  Id. at 30.

---

[9]     A log of seized contraband shows that a copy of the U.S. Army Ranger Handbook was taken from inmate Devonte Smotherman on November 15, 2007.  Dkt. # 43-4, at 42.

[10]    Ciempa's GRF regarding this incident states that he ordered four books and three were shipped.  Dkt. # 43-4, at 30.  However, he has not identified a third book shipped to him nor does he claim that a third book was confiscated.

The Grievance Response from Reviewing Authority, dated January 4, 2008,[11] denied Ciempa's requested relief, stating:

> In accordance with OP-030117, (Correspondence): Publications are prohibited that contain instructions for the manufacture of weapons and explosives or does create [sic] an unsafe correctional environment for the inmates and staff by containing instructions for self defense.  The four books (1) US Army Ranger Handbook, (2) Combat (3) Demolitions (4) Booby Traps have been deemed prohibited due to being a security risk.

Dkt. # 43-2, at 28.  Ciempa appealed, stating:

> I ordered Soldier's Guide, Daidoji Yuzan's Code of the Samurai (which was out of stock/not shipped) and Stoic Warriors. . . . None of these books, Soldier's Guide or Stoic Warriors . . ., were reviewed. . . . U.S. Army Ranger Handbook has nothing to do with my property.  And Combat, Demolitions and Booby traps are topics, not books, of U.S. Army Ranger Handbook, not my property.

Id. at 29.  On January 28, 2008, his appeal was returned unanswered for failure to follow proper grievance procedures regarding attachments to the grievance form.[12] Id. at 27.  Ciempa re-submitted his grievance on February 6, 2008.  Dkt. # 42-3, at 7.  It was again returned unanswered for attachments to the grievance form and "no informal action, 'Request to Staff' response."  Id. at 8.  Then, on March 13, 2008, Ciempa's grievance appeal was denied.  Id. at 15.

Ciempa states that The Soldier's Guide and Stoic Warriors are "indispensable [sic] and imperative reference tools to aid and assist him in effectively and competently carrying out the duties of his office . . . as an 'Older God,' otherwise known as an 'Officer,' that is, either, a Captain or Lieutenant, in relation and with respect to 'young Gods,' otherwise known as 'Non-commissioned Officers or N.C.O.s/Junior Enlisted Soldiers,' that is, private soldiers, especially those at D.C.C.C.,

---

[11]   The response was signed by defendant Harvanek and dated January 4, 2007, but the date appears to be a typographical error.

[12]   The form was signed by defendant Morton.  Dkt. # 43-2, at 27.

in the entire O.D.O.C. and outside prison . . . ." Dkt. # 18, at 6-7.  He states that the NGE's "central text, 120 Degrees, emphasizes military training for men who belong to I.S.L.A.M. in North America."  Dkt. # 52, at 14.

Ciempa re-ordered The Soldier's Guide in November 2008 while at JDCC.  Id. at 16.  He states that it was reviewed and approved for his possession.  On December 23, 2009 (after his return to DCCC), his cell at DCCC was searched and his copy of The Soldier's Guide was confiscated. Id.  He states that he has "initiated the Grievance Process to exhaust his available administrative remedies . . . ."  Id.  The LRC recommended that The Soldier's Guide be prohibited, citing OP-030117-10 and stating, "[t]his book contains instructions for the military, including numerous combat tasks.  Although this was accepted at JDCC, the offender is now at higher security and this book could be utilized as a threat to creating a correctional environment conducive to the physical safety of offenders and staff." Dkt. # 57, at 3.

The Soldier's Guide: The Complete Guide to U.S. Army Traditions, Training, Duties, and Responsibilities is published by the United States Department of the Army.  The forward states, in part, "[t]his Soldier's Guide applies to every soldier in the Army . . . . This manual describes your role in the Army, your obligations, and what you can expect from your leaders.  Other subject areas are Army history, training, and professional development.  This manual also describes standards in appearance and conduct and selected individual combat tasks that are important for every Soldier to master."  Chapter Five is titled "Training," and includes a section on "individual combat skills," listing "selected combat tasks that are important for every soldier whether in combat arms [ ], combat support [ ], and combat service support [ ] branches . . . ."  Appendix A provides conditions, standards, and performance steps for selected combat tasks.  By way of example, the performance

steps for the task of "engage targets with an M16A1 or M16A2 rifle" include instructions on how to assume an appropriate firing position based on the situation, and proper aiming technique.  The performance steps for "move over, through, or around obstacles (except minefields)" include methods of crossing under or over barbed wire and crossing over a wall.

The description of <u>Stoic Warriors</u> provided at the author's website states:

This book is about sucking it up.  It is about toughing it out in war and in hard times, in general.  Stoicism has long been used to describe a soldier heading off to endure the hardships of war and in accepting the accompanying misfortunes of battle without complaint.  It's a philosophy that has guided our men and women for centuries.  The Army, Navy, Air Force, and Marines are responsible for shaping the minds of our stoic warriors.  What are they teaching them and how does it control them?  What does history show us about the post-war mind?  Can soldiers truly cope with the hardships of battle?  Stoic Warriors is the first book to delve deeply into the psychological role modern and ancient Stoicism plays in the character of the military.

Dkt. # 42-2, at 2.

Ciempa states that, "[o]n several different occasions I have borrowed books about military philosophy, tactics, strategy, history, etc. from DCCC's Leisure Library, which has scores of books on such subjects."  Dkt. # 52, Ex. A.

G.     <u>Chapel Time Request</u>

On November 16, 2008, Ciempa submitted an RTS to Chaplain Remer at JDCC, stating, "I would like to conduct 'Parliaments' on the third Sunday of every month and 'Civilization Classes, Educational Classes and Study Groups' twice a week under the banner of the 5% Nation of I.S.L.A.M. or the 'Nation of Gods and Earths.'"  Dkt. # 43-8, at 31.  He requested that the chaplain provide space and time for such gatherings, "preferably in the Chapel."  <u>Id.</u>  The request was denied and forwarded to the agency chaplain for review.  Ciempa then submitted GRF No. JDG08-165 making the same request on December 15, 2008.  The grievance response from reviewing authority

stated, "[a]s stated by Chaplain Remer your initial request has been denied, however the information

you provided has been forwarded to the agency chaplain for review."  Dkt. # 43-8, at 27.  Ciempa's

appeal was denied.[13]  Id. at 26.

On November 7, 2008, defendant Brown, the ODOC Agency Chaplain, sent Remer an e-

mail, stating:

> I am writing in response to your questions concerning the Request to Staff you
> received asking for meeting space and time for the Nation of Gods and Earth[s].  Due
> to the racial and hate filled nature of the materials and doctrine of the Nation of Gods
> and Earth[s], also known as the 5%ers, we do not allow any meeting space or time
> for this group in the Religious Service area.  This has been our position in dealing
> with these questions at all of our facilities.

Dkt. # 43-10, at 2-3.

Ciempa states that "forming Ciphers (or Study Circles) . . . is vital to N.G.E. practice [and]

individual members' growth and development. . . . Denying me a forum to teach is tantamount to

denying me my cultural identity . . . ."  Dkt. # 52, Ex. A.

H.      Request for Special Diet

On November 16, 2008, Ciempa submitted an RTS to Remer requesting that JDCC

"[p]rovide [him a] Halal diet through Food Services and allow me to purchase Halal food products

from approved vendors . . . ."  Dkt. # 43-6, at 15.  The response stated, "[y]our request is being

denied.  According to OP-030112 'All religious restricted meals will be offered through a common

pork-free or meat free meal or kosher.'"  Id.  OP-030112 requires that "an offender who wishes to

receive [a religious restricted diet] must submit a "Special/Religious Diet Request Form" . . . to the

facility food service supervisor."  Dkt. # 43-10, at 6.  On November 25, 2008, Ciempa submitted

---

[13]     Morton signed the denial of Ciempa's appeal.  Dkt. # 43-8, at 26.

GRF No. 08-143, stating "I can eat kosher foods, but kosher is more restrictive than Halal . . . .

Anyhow, kosher is highly recommended for N.G.E. adherents."  Dkt. # 43-6, at 13.  He requested

to be allowed to "partake of kosher meals, as an alternative to Halal, if it will be less burdensome

on O.D.O.C. and will help facilitate the expression of my cultural (religious) beliefs.  Also, allow

me to purchase kosher/Halal food products from approved vendors for personal consumption and

for my Honor days*, especially since the Canteen is devoid of kosher/Halal meats, and/or dairy

products."  Id. at 13-14 (punctuation in original).  The December 22, 2008 grievance response from

reviewing authority states:

> In accordance with OP-030112 entitled "Religious Services", all religious restricted
> meals will be offered through a common pork-free or meat free meal or kosher diet.
> If you wish to receive one of these noted diets you must submit a 'Special/Religious
> Diet Request Form' to the food service manager.  She will review the request and if
> the request is for the kosher diet she will forward it to the facility chaplain for
> review.  Be reminded that the kosher diet is only provided to offenders who
> demonstrate their religious faith mandates compliance with a kosher diet.

Dkt. # 43-6, at 11.  Ciempa appealed, stating, "[t]he RA has misconstrued my request, which is not

for a 'common pork-free or meat-free meal or kosher,' but, instead, for a Halal diet.  Said Halal diet

would ensure that I am not consuming pork or, more importantly, pork by-products.  Also, it is less

restrictive than kosher, forbidding mixtures of meat and dairy."  He goes on to state, "Halal, or

kosher as a concession, is the easiest way to ensure I am not consuming pork or pork by-products

. . . ."  Id. (emphasis in original).  There is no record of Ciempa submitting a special/religious diet

request form in November or December 2008.  Dkt. # 43-10, at 9, 11.

15

The ODOC special/religious diet request form lists three special/religious diets available: pork free, meat free, and kosher. Id. at 7.[14] On October 29, 2009 (after his third amended complaint was filed), Ciempa submitted a special/religious diet request form. He crossed out the word "Kosher" and wrote "Halal." Dkt. # 53, Ex. J, at 2. The Chaplain denied his request, stating "[t]he [ODOC] does not offer a Halal diet. The Kosher Diet is available by [ODOC] policy OP-030112 only to those who have stated their religious faith to be either Jewish, Messianic Jewish or House of Yaweh. Nation of Gods and Earth[s] is not eligible for a Kosher Diet." Id. at 1.

I.      Request for Hygienic Products

On November 16, 2008, Ciempa sent an RTS to Remer stating, "[p]er my Cultural beliefs . . . which are religious in nature, I am to abstain from pork or pork by-products in my hygienic items, e.g., toothpaste, deodorant, soap, lotion, etc. See reverse for contact information." Dkt. # 43-6, at 8. He requested to be allowed "to purchase pork or pork by-product-free hygienic items from [NGE] approved vendors . . . ." Dkt. # 43-6, at 8. The response stated, "[t]his request is being returned unanswered. Please submit one item per request." Id.

On November 17, 2008, Ciempa submitted a second RTS to Remer stating, "I am an adherent of the 5% Nation or N.G.E. and I would like to use the vendor of my Nation's choice: Medina Industrial Corporation . . . ." Dkt. # 43-6, at 20. Ciempa requested that Remer "[c]onsider and, then, approve the above vendor." Id. The disposition, dated November 24, 2008, stated, "[a]ccording to OP-030112, this office 'will maintain a list/catalog of authorized vendors developed

---

[14]     The example of the special/religious diet request form submitted as part of the Martinez report is effective January 2009. Thus, it was not the form during the relevant time period. However, there is no evidence in the record that would suggest that the November/December 2008 form differed materially from the January 2009 form.

by the agency religious services coordinator.'  I will submit this request to the agency Chaplain for

review."  Id.

On November 25, 2008, Ciempa submitted GRF No. JDG08-142.  He stated, "the Chaplain's

response/disposition is entirely unreasonable.  My RTS addressed one (1) issue: pork- or pork by-

product-free hygienic items.  If I followed his instructions, I would have to submit at least 10-12

separate grievances, costing at least twenty to twenty-four dollars."  Dkt. # 43-6, at 7.  He requested

that he be allowed to "purchase hygienic items/cosmetics from an approved vendor, in accordance

with the dictates of my cultural (religious) beliefs."  Dkt. # 43-6, at 6.

> The grievance response from reviewing authority, dated December 18, 2008, stated:
>
> This office, along with Chaplain James Remer, conducted a visual inspection of the
> hygiene items sold in the JDCC canteen to check for any animal by-products.  The
> investigation revealed that the only items listed that could be considered questionable
> were the curl activator and the protein styling gel.  Both of these products contained
> an item listed as hydrolyzed animal protein, however the listing did not specify what
> type of animal was used.
>
> Unless you can provided [sic] verified documentation that the hygiene items sold in
> the canteen are unacceptable your request to purchase hygiene items from another
> vendor is denied.

Dkt. # 43-6, at 4.  Ciempa appealed stating:

> [M]y clergy was not contacted.  Is this due to your non-recognition policy towards
> the N.G.E.? . . . The overwhelming majority of basic ingredients may or may not be
> pork- or pork by-product-free depending on their origin or processing history.
> Accordingly, they require clerical supervision to insure that their origin is from a
> pork- or pork by-product free product and that they were processed with the proper
> equipment.  Who is your resident chemist or cleric on these issues? . . . Are you
> indifferent to my beliefs?  Shouldn't you err on the side of caution?

Dkt. # 43-6, at 5.  The reviewing authority's response was affirmed on January 15, 2009.  Dkt. # 43-

6, at 3.

Ciempa submitted GRF No. JDG08-144 on November 25, 2008. This form was substantially similar to GRF No. JDG08-142, but also stated "I am sure the agency chaplain and this chaplain are familiar with said company/vendor. I am sure ODOC and ODOC inmates have utilized said vendor in . . . [remainder not in the record]." Dkt. # 43-6, at 19. The grievance response from reviewing authority was virtually identical to the response to GRF No. JDG08-142. Dkt. # 43-6, at 18.

On November 25, 2008, Ciempa submitted an RTS form to "Chaplain" requesting that he facilitate the purchase of "pork-free soap (African Black Soap or Palm Oil Soap)." Dkt. # 43-6, at 26. On December 5, 2008, Ciempa submitted GRF No. JDG08-148. He stated, "I shouldn't have to file thirteen separate grievances behind one issue, i.e., pork- or pork by-product-free hygienic items. This is entirely unreasonable. This implicates my federally protected rights to freely exercise my religious beliefs. For further assistance, contact: The National Office of Cultural Affairs . . . for the Nation of Gods and Earths . . ., Born King Allah, Prison Administrator . . . . Soap is mandated." Dkt. # 43-6, at 25. Ciempa requested that the reviewing authority "[c]ontact said outside religious authority and permit me to purchase said hygienic item from an approved vendor." Id. at 25-26. The grievance response from reviewing authority was virtually identical to the response to GRF No. JDG08-142. Dkt. # 43-6, at 23. Ciempa appealed, stating:

> My clergy was not contacted. Did the RA call [telephone number] or visit [internet address], for example? Or the manufacturers of Tone? . . . Where does Sodium Tallowate (Sodium Cooate and/or Sodium Palm Kernalate) come from? What about Hydrogenated Tallow Acid, for example? Beef, sheep or Pork? Is the RA a Chemist or Cleric?

Id. at 24 (emphasis in original). Ciempa submitted similar RTSs, GRFs, and appeals relating to hand/face cream, Dkt. # 43-6, at 31, moisturizing lotion, Dkt. # 43-6, at 37, and other hygienic products. His grievances and appeals were denied.

18

Ciempa submitted an affidavit stating that he does not want a chemical analysis performed on each product in the canteen.  Dkt. # 52, Ex. A.  He "was only pointing out that ODOC officials are not qualified to pronounce products permissible under Judaic or Islamic Law or N.G.E. Hygienic/Dietary laws."  Id.

J.      Procedural History of this Case

Ciempa filed his initial complaint (Dkt. # 1) in this case on November 20, 2008.  He filed an amended complaint (Dkt. # 6) on December 8, 2008, a second amended complaint (Dkt. # 10) on December 31, 2008, and a third amended complaint (Dkt. # 18) on June 2, 2009.  On July 10, 2009, Ciempa filed a "motion for preliminary injunction and/or temporary restraining order" (Dkt. # 24).  On July 14, 2009, the Court entered an Opinion and Order (Dkt. # 26) directing service of the third amended complaint and preparation of a special report pursuant to Martinez v. Aaron, 570 F.2d 317 (10th Cir. 1978), and denying Ciempa's motion for a preliminary injunction.  The Martinez report (Dkt. # 43) was filed on October 23, 2009.  Defendants have filed a motion to dismiss and/or for summary judgment (Dkt. # 42).

**II.**

Both parties have submitted extensive factual materials.[15]  Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d

---

[15]    Ciempa has submitted factual materials as attachments to various pleadings and as stand-alone submissions to the Court.  For good cause shown, Ciempa's motions to supplement the record (Dkt. ## 56, 57, 58) are granted and the submitted materials are deemed part of the record on summary judgment.  Similarly, the materials attached to Plaintiff's Motion to Reassert his Motion for Preliminary Injunction (Dkt. # 53) are deemed part of the record on summary judgment.  The Court has reviewed all materials submitted by the parties.

848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court draws "all justifiable inferences," id. at 254, and construes the record in the light most favorable, Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998), to the party opposing summary judgment.

Pro se pleadings must be liberally construed.  See Haines v. Kerner, 404 U.S. 519, 520 (1972).  Nevertheless, the court should not assume the role of advocate, and should dismiss claims which are supported only by vague and conclusory allegations.  Hall, 935 F.2d at 1110.  Moreover,

even <u>pro</u> <u>se</u> plaintiffs are required to comply with the "fundamental requirements of the Federal

Rules of Civil Procedure."  <u>Ogden v. San Juan County</u>, 32 F.3d 452, 455 (10th Cir. 1994).

## III.

Ciempa brings the following claims: 42 U.S.C. § 1983 claims for violation of his First,

Fourth, and Fourteenth Amendment rights and a RLUIPA claim arising out of the denial of <u>The Five</u>

<u>Percenter</u>; § 1983 claims for violation of his First, Fourth, and Fourteenth Amendment rights and

a RLUIPA claim arising out of the prevention of correspondence with G. Kalim; § 1983 claims for

violation of his First, Fourth, and Fourteenth Amendment rights and a RLUIPA claim arising out

of the prohibition/confiscation of books; § 1983 claims for violation of his First and Fourteenth

Amendment rights and a RLUIPA claim arising out of the denial of his request for space and time

in the prison chapel; § 1983 claims for violation of his First and Fourteenth Amendment rights and

a RLUIPA claim arising out of the denial of his request for a special diet; and § 1983 claims for

violation of his First and Fourteenth Amendment rights and a RLUIPA claim arising out of the

denial of his request to purchase pork-free hygienic products and the approval of an NGE vendor.

He names multiple defendants, in their official and individual capacities.

For the purposes of this case, the Court treats the NGE as a religion within the meaning of

the First Amendment and RLUIPA.[16]   The Court will first consider the legal sufficiency of the

---

[16]     Although one court has determined that the NGE is not a religious group, that determination
was based on the NGE's disavowal of the label "religion" and its attempts to distance itself
from mainstream Islam.  <u>See</u> <u>Harrison v. Watts</u>, 609 F. Supp. 2d 561, 571-73 (E.D. Va.
March 26, 2009).  Such reasoning is unpersuasive in this case, where there is significant
evidence that the NGE has characteristics similar to those associated with more mainstream
religions.  The Court will not engage in a determination of what is and is not a religion.
Further, several other courts have assumed that the NGE is a religious group for First
Amendment and RLUIPA purposes.  <u>See, e.g.</u>, <u>Harbin-Bey v. Rutter</u>, 420 F.3d 571 (6th Cir.
2005) (affirming designation of NGE as a prison gang and security threat group); <u>Fraise</u>, 283

claims associated with each incident.  The Court will then proceed to consider the proper defendants, the defense of qualified immunity, and the proper potential remedies.

**A.     Ciempa's Claims**

1.     Denial of the Five Percenter

Ciempa argues that his First, Fourth and Fourteenth Amendment and RLUIPA rights were violated by the prohibition of The Five Percenter.  As a preliminary matter, the Court finds that Ciempa's claim that The Five Percenter was banned outright is patently contradicted by the record evidence. Ciempa received several issues of The Five Percenter, and the undisputed evidence shows that, pursuant to ODOC policy, each issue was reviewed individually.  Thus, to the extent that Ciempa seeks to bring a claim based on a complete ban on The Five Percenter, defendants are entitled to summary judgment on such claim.  The Court will consider Ciempa's claim relating to the denial of particular issues of The Five Percenter.

a.     First Amendment

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."  Turner v. Safley, 482 U.S. 78, 84 (1987).  Inmates retain "'those [constitutional] rights that are not inconsistent with [their] status as prisoner[s] or with the legitimate penological objectives of the corrections system.'"  Id. at 94 (quoting Pell v. Procunier, 417 U.S.  817, 822 (1974)).

In order to state a free exercise claim, a prisoner-plaintiff "must first show that a prison regulation 'substantially burdened . . . sincerely-held religious beliefs.'"  Kay v. Bemis, 500 F.3d

---

F.3d 506; In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464;  Marria, 2003 WL 21782633.

1214, 1218 (10th Cir. 2007) (quoting Boles v. Neet, 486 F.3d 1177 (10th Cir. 2007)).  Prison regulations affecting free speech or free exercise are 'valid if [they are] reasonably related to legitimate penological interests.'" Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (quoting Turner, 482 U.S. at 89); see also Hammons v. Saffle, 348 F.3d 1250, 1255 (10th Cir. 2003) ("[i]nmates' free exercise rights are . . . subject to prison restrictions rationally related to legitimate penological interests"); Ind v. Wright, 52 Fed. App'x 434, 437 (10th Cir. 2002) (unpublished)[17] ("regulations governing the receipt of reading materials by inmates must be analyzed under a reasonableness standard, and . . . such regulations are valid if they are reasonably related to a legitimate penological interest").  Further, neutral, generally applicable laws do not violate the Free Exercise Clause, even if they have an incidental effect on religious practice.  Emp't Div. v. Smith, 494 U.S. 872 (1990). The Tenth Circuit balances the factors outlined in Turner, 482 U.S. 78, to determine the validity of a prison regulation.  See Kay, 500 F.3d at 1219; Hammons, 348 F.3d at 1255.  First, a court is to consider "whether there is a logical connection between the prison regulation and the asserted penological interest.  Hammons, 348 F.3d at 1255; see also Turner, 482 U.S. at 89-91.  Second, courts consider " whether there are alternative means of exercising the right that remain open to prison inmates."  Turner, 482 U.S. at 90.  Third, courts assess "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." Thornburgh, 490 U.S. at 418.  Fourth, courts consider "whether any policy alternatives exist that would accommodate the right in question at a de minimis cost to the prison."  Hammons, 348 F.3d at 1255.

---

[17]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. P. 32.1: 10th Cir. R. 32.1.

OP-030117 states, in relevant part, "[p]ublications are prohibited that . . . [a]dvocate terrorism, criminal behavior, racial, religious, or national hatred, or any material that creates an unsafe environment for the inmates or staff. . . . Correspondence containing gang related material, information, photographs, or symbols are prohibited." Dkt. # 42-4, at 3-5. This policy burdens Ciempa's free speech and free exercise rights because it has been applied to deny him several issues of his religious/community publication. However, the regulation is reasonably related to the legitimate penological interest of maintaining prison order and security. See Johnson, 2008 WL 828086, at *3 (determining that a prohibition on all mail relating to a designated security threat group was reasonably related to the legitimate penological goal of maintaining order and security); see also Cooper, 2003 WL 23350443, at *1 (finding no First Amendment violation in confiscation of plaintiff's NGE medallion because "[a]though the plaintiff has the right to religious material as protected material, [he] does not have the right to possess security threatening material simply because it has alleged religious ties"). Individualized review of incoming publications is a rational means of achieving that objective. See Ind, 52 Fed. App'x at 437-38 (determining that Colorado prison regulation prohibiting mail that could encourage or endorse violence, hatred, or contempt of other persons was rationally related to a legitimate penological interest).

Further, the policy was reasonably applied. Prison officials reasonably concluded that denied issues of The Five Percenter contained gang-related material or other material that creates an unsafe prison environment. Cf. id. at 438 (noting that prison administrators are not required to limit their exclusions to materials "likely" to lead to violence). Prison officials in other states have reached similar conclusions. See, e.g., Johnson, 2008 WL 828086, at *3 (upholding an outright ban on The Five Percenter because it "contains threat group symbols and signs and articles which advocate

24

racial supremacy"). Even where claims are based on the First Amendment, it is inappropriate for courts to "'substitute [their] judgement on . . . difficult and sensitive matters of institutional administration' . . . for the determinations of those charged with the formidable task of running a prison." O'Lone v. Estate of Shabazz, 482 U.S. 342, 353 (1987) (quoting Block v. Rutherford, 468 U.S. 576, 588 (1984)). This Court will not second-guess the LRC's determination that particular issues of The Five Percenter contained material that could create an unsafe prison environment. The first Turner factor is satisfied.

Regarding the second Turner factor, review and denial of particular issues of The Five Percenter does not deprive Ciempa of all means of exercising his religion. It is undisputed that he has received several issues of The Five Percenter and other NGE-related publications. See Hammons, 348 F.3d at 1256 ("the mere diminishment, as opposed to complete denial, of [plaintiff's] spiritual experience is relevant in determining whether the proffered penological interests suffice to justify the infringement").

Finally, allowing inmates to receive material that contains gang symbols or other threatening content would have a significant negative impact on other inmates and prison guards because it would make the prison environment less safe. Thus, the third Turner factor is satisfied. The record does not contain evidence of policy alternatives or their potential cost to ODOC. However, the Tenth Circuit has held that a prison's decision to withhold entire issues of a magazine, rather than redacting offending portions, was a reasonable policy choice given that the costs of a redaction policy would be prohibitive. Shabazz v. Parsons, 127 F.3d 1246, 1249 (10th Cir. 1997). The Turner factors weigh in favor of ODOC's decision to deny particular issues of The Five Percenter.

OP-030117 is valid because it is rationally related to a legitimate penological interest, and it was reasonably applied in Ciempa's case. Therefore, defendants are entitled to summary judgment on Ciempa's First Amendment claims relating to the denial of specific issues of <u>The Five Percenter</u>.

b.      <u>RLUIPA</u>

RLUIPA prohibits a government from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution . . ., even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "Religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7). The standards under RLUIPA are more strict than those under the Free Exercise Clause. <u>Abdulhaseeb v. Calbone</u>, 600 F.3d 1301, 1314 (10th Cir. 2010). In order to proceed with a RLUIPA claim, a plaintiff must demonstrate "he wishes to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government."[18] <u>Id.</u> at 1312. A religious exercise is substantially burdened under RLUIPA

> when a government (1) requires participation in an activity prohibited by a sincerely held religious belief, or (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief, such as where the government presents the plaintiff with a Hobson's choice -- an illusory choice where the only

---

[18]      Courts must not judge the truth, significance, or centrality of the belief in question, but may inquire into the sincerity of a prisoner's professed religiosity. <u>Lovelace v. Lee</u>, 472 F.3d 174, 187 n.2 (4th Cir. 2006) (cited in <u>Abdulhaseeb</u>, 600 F.3d 1314 n.6).

realistically possible course of action trenches on an adherent's sincerely held religious belief.

Id. at 1315.  Once the plaintiff produces prima facie evidence to support a claim, the government must show that the substantial burden is necessary to further a compelling governmental interest and is the least restrictive means of furthering that interest.[19]  42 U.S.C. § 2000cc-2(b).

While RLUIPA imposes a compelling interest standard, "'context matters' in the application of that standard."  Cutter v. Wilkinson, 544 U.S. 709, 722 (2005) (quoting Grutter v. Bollinger, 539 U.S. 306, 327 (2003)).  In passing RLUIPA, Congress was "mindful of the urgency of discipline, order, safety, and security in penal institutions," and "anticipated that courts would apply [RLUIPA's] standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" Id. at 722-23 (quoting S. REP. NO. 103-11, at 10 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1899, 1900).  The ODOC has a compelling interest in maintaining prison security and order.  See id. at 723 n.11 ("[c]ourts . . . may be expected to recognize the government's . . . compelling interest in not facilitating inflammatory racist activity that could imperil prison security and order").

Ciempa describes The Five Percenter as "a central link and mechanism of communication with members of the Five Percenter community outside prison . . . ." Dkt. # 18, at 5.  Ciempa has failed to establish that the denial of particular issues constitutes a substantial burden on his religious exercise.  While failure to receive The Five Percenter may make it somewhat more difficult to engage with other members of the NGE community and receive religious teaching, the burden is not

_____

[19]     The plaintiff retains the burden to show that his religious exercise is substantially burdened. 42 U.S.C. § 2000cc-2(b).

27

substantial because Ciempa has been permitted to receive some issues of <u>The Five Percenter</u>, as well as other NGE-related correspondence and reading material.[20]   Denial of certain issues of a religious/community newspaper does not prevent Ciempa from practicing his religion or pressure him to alter his beliefs or practices.  See <u>Cartwright</u>, 2008 WL 2944668, at *2 n.2 (determining that plaintiff had failed to show that classification of NGE as a security threat group and ban on NGE material would constitute a substantial burden on his religious exercise); <u>cf. also</u> <u>Abdulhaseeb</u>, 600 F.3d at 1321 ("[w]e are not willing to conclude . . . that every single presentation of a meal an inmate considers impermissible constitutes a substantial burden on an inmate's religious exercise").

For these reasons, defendants are entitled to summary judgment on Ciempa's RLUIPA claim arising out of the prohibition of particular issues of <u>The Five Percenter</u>.

c.      <u>Fourth Amendment</u>

The Fourth Amendment applies when a plaintiff can claim a justifiable, reasonable, or legitimate expectation of privacy that has been invaded by government action.  <u>Smith v. Maryland</u>, 442 U.S. 735, 740 (1979); <u>see also</u> <u>Katz v. United States</u>, 389 U.S. 347 (1967).  Because a prisoner does not have a legitimate expectation of privacy in his or her cell, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell."  <u>Hudson v. Palmer</u>, 468 U.S. 517, 526 (1984).  Further, prisoners have no legitimate expectation of privacy in non-privileged incoming mail if prison regulations provide that mail may be inspected.  See <u>United States v. Gordon</u>, 168 F.3d 1222, 1228 (10th Cir. 1999).

---

[20]     Because the burden is not substantial, the Court need not determine whether receipt of <u>The Five Percenter</u> is a religious exercise protected by RLUIPA.

ODOC regulations clearly provide that incoming mail may be inspected.  Therefore, Ciempa had no legitimate expectation of privacy in the prohibited issues of <u>The Five Percenter</u> and his Fourth Amendment claim fails.

d.    <u>Due Process</u>

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's[21] protection of liberty and property. . . . [T]he range of interests protected by procedural due process is not infinite."  <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. 564, 569-70 (1972).  In order to state a procedural due process claim, a plaintiff must first establish the existence of a recognized property or liberty interest.  <u>Stidham v. Peace Officer Stds. and Training</u>, 265 F.3d 1144, 1149 (10th Cir. 2001).  The Tenth Circuit has held that liberty and property interest claims by prisoners are to be analyzed under the standard set forth in <u>Sandin v. Conner</u>, 515 U.S. 472 (1995).  "A deprivation occasioned by prison conditions or regulations does not . . . require procedural due process protection unless it imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  <u>Steffey v. Orman</u>, 461 F.3d 1218, 1221 (10th Cir. 2006) (quoting <u>Sandin</u>, 515 U.S. at 484).  Among other things, "an inmate's right to receive mail and other packages may be limited by prison regulations that are reasonably related to legitimate penological interests."  <u>Id.</u> at 1222.

The Court has already determined that OP-030117 is reasonably related to legitimate penological interests.  <u>See</u> Part III.A.1.a, <u>supra</u>.  The prohibition of certain issues of <u>The Five Percenter</u> did not impose an "atypical and significant hardship" on Ciempa because it was merely

---

[21]    Ciempa also mentions the Fifth Amendment Due Process Clause.  The Fifth Amendment Due Process Clause applies to the Federal government only.

a prohibition of contraband material.  Ciempa has no protected interest in The Five Percenter and defendants are entitled to summary judgment on Ciempa's Due Process claim relating to the denial of particular issues of The Five Percenter.

e.      Equal Protection

Equal protection "is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  Where a classification targets a suspect class or involves a fundamental right, it must be narrowly tailored to achieve a compelling governmental interest.  KT. & G Corp. v. Attorney Gen. of Okla., 535 F.3d 1114, 1137 (10th Cir. 2008).  If it does not, it need only be rationally related to a legitimate government purpose.[22]  Id.  Religion and race are suspect classifications.  See, e.g., Abdulhaseeb, 600 F.3d at 1322 n.10 (religion); Save Palisade FruitLands v. Todd, 279 F.3d 1204, 1210 (10th Cir. 2002) (race).  In order to violate the equal protection clause, state action must be motivated by an improper purpose, rather than merely having a disparate impact.  Washington v. Davis, 426 U.S. 229, 239-42 (1976).

Ciempa asserts that "other religious materials or groups similarly situated (e.g. Odinists, etc.) are not subject to said oppressive and abusive interdictory measures" Dkt. # 18, at 5.  This unsupported, conclusory allegation is insufficient to support an equal protection claim.  See L&M Enters., Inc. v. BEI Sensors & Sys. Co., 231 F.3d 1284, 1287 (10th Cir. 2000) ("[u]nsupported conclusory allegations . . . do not create a genuine issue of fact").  Further, there is no evidence that OP-030117 was motivated by a discriminatory purpose or that prison officials prohibited particular issues of The Five Percenter because of Ciempa's race or religion.  Therefore, defendants are

---

[22]      Gender-based classifications are subject to intermediate scrutiny.

entitled to summary judgment on Ciempa's equal protection claim relating to the denial of particular issues of The Five Percenter.

2.      Correspondence

Ciempa alleges that DCCC interdicted his correspondence addressed to "Almighty Divine Justice Allah, G. Kalim, Editor, and/or Allah School in Mecca." He has provided no evidence to support this assertion. Had such correspondence been prohibited, DCCC would have issued a prohibited correspondence notification. There is no record of such a notification in this case. Further, the undisputed evidence shows that Ciempa has been permitted to engage in NGE-related correspondence with persons outside prison. See, e.g., Dkt. # 52, Exs. E-J. Therefore, defendants are entitled to summary judgment on Ciempa's claims regarding correspondence with G. Kalim.

3.      Books

Ciempa alleges that defendants ascribed the U.S. Army Ranger Handbook to him "for purposes of oppressively and abusively depriving him of his lawful property . . . ." Dkt. # 18, at 7. There is no evidence that Ciempa suffered any legally cognizable injury due to the LRC's erroneous assumption that the U.S. Army Ranger Handbook was his. Ciempa has failed to state a claim based on such book.

It is undisputed that Ciempa ordered The Soldier's Guide and Stoic Warriors in late 2007 but did not receive them. Ciempa subsequently ordered and received a copy of The Soldier's Guide while at JDCC, and that copy was later confiscated at DCCC. Ciempa states that "these books would help him further his knowledge and deepen his understanding of his central text, 120° . . ., and carry out his duties as a member of the [NGE], vis-a-vis 'neophytes' . . . ." Dkt. # 52, at 2. He

argues that the denial of these books deprived him of his First, Fourth, and Fourteenth Amendment and RLUIPA rights.

a.      First Amendment

There is no evidence that The Soldier's Guide or Stoic Warriors were formally reviewed or denied in 2007.   However, denial (whether formal or informal) of the two books was rationally related to the legitimate penological interest of maintaining prison safety.   The Soldier's Guide contains instructions on how to scale walls and travel under or over barbed wire.   Stoic Warriors contains information regarding how warriors are trained to cope with battle.   For the same reasons as stated in Part III.A.1.a, supra, DCCC's decision to prohibit these books survives First Amendment scrutiny under the Turner factors.   The same is true for DCCC's decision to confiscate Ciempa's copy of The Soldier's Guide in late 2009 or early 2010.   Therefore, defendants are entitled to summary judgment on Ciempa's First Amendment claim regarding the denial of his two books.

b.      RLUIPA

Ciempa has provided evidence that he sincerely believes that studying The Soldier's Guide and Stoic Warriors is important to his NGE practice and that DCCC has substantially burdened this practice.   E.g., Dkt. # 52, Ex. A, at 3 ("[b]ased on 120°, I believe all men who practice I.S.L.A.M. should have a basic understanding of military principles, traditions, training, duties and responsibilities, etc.").   Among other things, denial of these books prevents him from "carry[ing]

out his duties as a member of the [NGE], vis-a-vis 'neophytes' . . . ."[23]  Dkt. # 52, at 2.  He has

established the elements of a prima facie case under RLUIPA.  Therefore, the burden shifts to

defendants to show that the prevention of these books was the least restrictive means of achieving

a compelling governmental interest.

This case highlights the difficult and delicate decisions that prison officials (and courts that

review their decisions) must make when attempting to accommodate potentially disruptive, violent,

or otherwise dangerous religious practices while ensuring prison safety.  It also highlights the

difference between the deferential rational basis review that neutral, generally applicable policies

receive under the First Amendment and the strict scrutiny that such policies receive under RLUIPA.

Ciempa's religious need to study military tactics directly conflicts with the ODOC's compelling

interest in maintaining prison order and security, see Cutter, 544 U.S. at 723 n.11 (describing the

interest in prison security and order as "compelling").  The question is whether the denial of these

particular books was the least restrictive means of achieving this interest.

The Soldier's Guide is a part of the record on summary judgment[24] and the Court has

independently reviewed its contents.  The book provides instructions on, among other things, scaling

walls and traveling under or over barbed wire and combat techniques.  These instructions could be

used to facilitate prison escape.  Preventing this book was the least restrictive means of ensuring that

---

[23]     It is not clear whether Ciempa needs these particular books for his NGE practice and duties.
Drawing all reasonable inferences in Ciempa's favor, the Court assumes the denial of these
two books substantially burdens his religious practice because other, permissible military
books (such as those in the prison library) would not satisfy his need to study military tactics
and principles.  Going forward, Ciempa must demonstrate that the denial of these specific
books substantially burdens his religious exercise.

[24]     The submitted copy of The Soldier's Guide includes DCCC's identifications of objectionable
sections.

Ciempa did not receive information that would facilitate violence or escape. Cf. Jova v. Smith, 582 F.3d 410, 416-17 (2nd Cir. 2009) (determining that prohibition of plaintiff's religiously-mandated martial arts training was the least restrictive means of ensuring institutional safety). The fact that JDCC administrators allowed Ciempa to possess the book does not change the Court's conclusion. DCCC administrators determined that the higher security level at DCCC warranted confiscation of the book. Mindful of the need to accord "due deference to the experience and expertise of prison and jail administrators," and applying RLUIPA "with particular sensitivity to security concerns," Cutter, 544 U.S. at 716, 722, the Court finds that banning The Soldier's Guide was the least restrictive means of achieving the compelling interest in prison order and safety.

In contrast, Stoic Warriors is not part of the record on summary judgment. The publisher's description of Stoic Warriors does not suggest that the book contains information constituting a specific threat to prison order or security. From the description, it appears that the book is about the warrior ethos and the history of stoicism in the military. Defendants, at this stage of the proceedings, have failed to meet their burden to show that prohibiting this book was the least restrictive means of achieving a compelling interest. Whereas rational basis review permits a court "to hypothesize interests that might support" a decision, Tuan Anh Nguyen v. I.N.S., 533 U.S. 53, 77 (2001), RLUIPA's strict scrutiny standard requires courts to consider only the actual reasons for a decision. Defendants have provided no substantive, specific explanation of why Stoic Warriors was prohibited. See Abdulhaseeb, 600 F.3d at 1318-19 (reversing the district court's grant of summary judgment because the record did not contain evidence of why prison officials refused a request or that they considered other alternatives). Defendants' general assertion that the book is inappropriate is insufficient, especially given that the book is not obviously inappropriate for a

correctional setting.  Further, based on the current record, the Court finds no meaningful distinction between Stoic Warriors and many of the military books available in the DCCC prison library, for example: SEALS at War; U.S. Special Forces; and Warrior Soul.  See Dkt. # 52, Ex. U.  At this time, defendants have failed to show that prohibiting Stoic Warriors is the least restrictive means of achieving DCCC's compelling interest in maintaining prison safety and order.   Therefore, defendants are not entitled to summary judgment on Ciempa's RLUIPA claim regarding the denial of Stoic Warriors.[25]

c.      Fourth Amendment

For the same reasons as stated in Part III.A.1.c, supra, Ciempa had no legitimate expectation of privacy in incoming mail.  Therefore, defendants are entitled to summary judgment on Ciempa's Fourth Amendment claim regarding the denial of his books.

d.      Due Process

For the same reasons as stated in Part III.A.1.d, supra, DCCC's prevention or confiscation of material rationally designated as contraband did not impose an "atypical and significant hardship" on Ciempa, so he had no protected interest in the books. The fact that DCCC may not have followed its standard procedures regarding review and prohibition of contraband mail is immaterial.  Prison regulations do not confer due process rights on inmates.  Sandin, 515 U.S. at 482; see also Cooper v. Jones, No. 10-6003, 2010 WL 1444897, at * 2 (10th Cir. Apr. 13, 2010) (unpublished)[26] ("[t]he process due here is measured by the Due Process Clause of the United States Constitution, not the

---

[25]     This determination is subject to the Court's analysis of individual defendants and damages. See Part III.C, infra.

[26]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. P. 32.1: 10th Cir. R. 32.1.

35

internal policies of the prison"). Therefore, defendants are entitled to summary judgment on Ciempa's due process claim regarding the denial or confiscation of his books.

e.      Equal Protection

Ciempa has not identified any other similarly situated inmates who were treated differently than he was, nor is there any evidence that the denial of Ciempa's books was motivated by a discriminatory purpose. For the same reasons as stated in Part III.A.1.e, supra, defendants are entitled to summary judgment on Ciempa's equal protection claim regarding the denial of his books.

4.      Chapel Time Request

Ciempa alleges that ODOC[27] has denied his request for space and time in the prison chapel to conduct NGE classes or meetings, in violation of his First and Fourteenth Amendment and RLUIPA rights. Ciempa states that the requested classes would be "a forum for the expression and practice of his cultural (religious) beliefs and rites with members and non-members alike." Dkt. # 18, at 8. He states that "denying me a forum to teach is tantamount to denying me my cultural identity . . . ." Dkt. # 52, Ex. A, at 4. His request was denied because ODOC has a state-wide policy of denying religious meeting space and time to the NGE "due to the racial and hate filled nature of the materials and doctrine of the Nation of Gods and Earth[s]." Dkt. # 43-10, at 2-3.

Ciempa also makes vague assertions that he has been injured because ODOC refuses to formally recognize the NGE. E.g., Dkt. # 18, at 8. To the extent that Ciempa attempts to assert a claim based solely on the lack of formal recognition, such claim is without merit. Failure to

---

[27]     Ciempa's request was made while he was at JDCC. Defendants have not argued that his claims are moot because he has been transferred back to DCCC. Further, his request for chapel time was denied pursuant an ODOC-wide policy that, presumably, remains in effect. Therefore, Ciempa's claim is not moot.

recognize a religious group in itself does not restrict one's religious practice; the <u>consequences</u> of nonrecognition affect religious practice. <u>See</u> <u>Hardeman v. Stewart</u>, 195 Fed. App'x 706, 708-09 (10th Cir. 2006) (unpublished)[28] ("[w]e do not see how failure to recognize [plaintiff's] faith has in itself any effect of restricting his religious practice"); <u>see also</u> <u>Cartwright</u>, 2008 WL 2944668, at *2 n.2 (determining that governmental action of classifying the NGE as a security threat group did not substantially burden plaintiff's exercise of religion).

a.   <u>First Amendment</u>

Ciempa asserts that the denial of meeting space and time violates his First Amendment rights of free speech, religious exercise, and association.[29]   ODOC does not allow NGE meetings in religious services facilities because it has concluded that NGE doctrine and materials are "racial and hate-filled." ODOC's refusal to provide meeting space and time to groups it deems a security threat is rationally related to the legitimate interest of maintaining prison order and safety.[30] ODOC's determination that NGE doctrine and materials are "racial and hate-filled" is supported by evidence in the record, including articles and photographs in <u>The Five Percenter</u>. This is sufficient to survive

---

[28]   Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. P. 32.1: 10th Cir. R. 32.1.

[29]   To the extent that prisoners retain associational rights, they are subject to regulation rationally related to a legitimate penological interests. Further, "freedom of association is among the rights least compatible with incarceration." <u>Overton v. Bazzetta</u>, 539 U.S. 126, 131 (2003).

[30]   The policy of not providing meeting space to groups that pose a security threat is content-neutral. The fact that the content or beliefs of a particular religious group might contribute to that group being deemed a security risk does not mean that the security risk policy itself is directed at content or religion. <u>Cf.</u> <u>Fraise</u>, 283 F.3d at 516 (determining that a prison's security threat group policy, which considers the history and purpose of the potential threat group, was neutral and did not take religion into account).

rational basis review.  Defendants are entitled to summary judgment on Ciempa's First Amendment claims regarding the denial of chapel time.

b.    RLUIPA

Ciempa has made a prima facie case that denying his request for chapel time substantially burdens his religious exercise.  He asserts that holding meetings and teaching are important to his NGE practice and identity.  Therefore, defendants bear the burden of showing that banning the NGE from the chapel is the least restrictive means of achieving a compelling interest.  Although the Court has determined that ODOC could rationally conclude that the NGE constitutes a security threat, see Part III.A.4.a, supra, the only evidence that ODOC actually reached such a conclusion is the Agency Chaplain's e-mail to Remer.  This e-mail does not contain specific information as to the basis for ODOC's conclusion.  See Abdulhaseeb, 600 F.3d at 1318 ("inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RLUIPA's] requirements") (quoting 146 Cong. Rec. 16698-99 (July 27, 2000)).  By way of example, there is no evidence that NGE members have caused disruptions in ODOC prisons.  Further, defendants have submitted no evidence that ODOC considered alternatives to a complete denial of chapel time to the NGE.  Therefore, even assuming the NGE is a security threat, there is insufficient evidence that the ODOC's policy is the least restrictive means of maintaining prison order and security.  See Abdulhaseeb, 600 F.3d at 1319 (noting that there was no discussion of whether the prison's refusal to accommodate prisoner's religious request was the least restrictive means the state could employ to satisfy its interests).  Defendants have failed to meet their burden at this time.  Therefore, defendants are not entitled to summary judgment on Ciempa's RLUIPA claim regarding the denial of chapel time.

c.      Due Process

There is no evidence that ODOC's refusal to permit NGE meetings in the prison chapel imposes an atypical and significant hardship on Ciempa.  It is the essence of incarceration that one may not have the space, time, and freedom to meet with people of one's choosing and engage in desired activities while imprisoned.  Defendants are entitled to summary judgment on Ciempa's due process claim regarding the denial of chapel time.

d.      Equal Protection

Ciempa asserts that "other religions or religious groups similarly situated are not subject to such oppressive and abusive measures . . . ."  Dkt. # 18, at 9.  This unsupported conclusory allegation does not create a genuine issue of material fact.  There is no evidence that similarly-situated individuals or religious groups were treated differently, or that ODOC's policy was motivated by an improper purpose.  Therefore, defendants are entitled to summary judgment on Ciempa's equal protection claim regarding the denial of chapel time.

5.      Request for a special Diet

Ciempa alleges that prison officials refused his request for a special diet, in violation of his First and Fourteenth Amendment and RLUIPA rights. The Prison Litigation Reform Act of 1996, 42 U.S.C. § 1997e et seq. (PLRA), requires prisoners to exhaust prison grievance procedures before bringing suit under federal law.  42 U.S.C. § 1997e(a); see also Jones v. Bock, 549 U.S. 199, 202 (2007).  Defendants argue that Ciempa has failed to exhaust administrative remedies regarding his request for a special diet, and that such claim should, therefore, be dismissed.  Dkt. # 42, at 26. Ciempa submitted a special/religious diet request form with the word "Kosher" crossed out and the word "Halal" handwritten on October 29, 2009, after the filing of his third amended complaint.

39

There is no evidence that Ciempa appealed the chaplain's denial of this request. Therefore, he has not exhausted available administrative remedies. To the extent that Ciempa seeks to state a claim based on the denial of a Kosher diet, such claim must be dismissed for failure to exhaust available administrative remedies.

However, as Ciempa points out, the special/religious diet request form could not be used to request a Halal diet, because no such diet is offered. Dkt. # 52, at 2. Ciempa submitted RTSs and GRFs (prior to his submission of the special/religious diet request form in 2009) regarding a Halal diet, and his requests and appeal were denied. Therefore, he has exhausted his available remedies regarding his request for a Halal diet. Ciempa requested a Halal diet in his RTS and GRF, but he also stated that he could "partake of kosher meals, as an alternative to Halal," Dkt. # 43-6, at 13, and that he would accept kosher meals "as a concession," id. at 11.

a.      First Amendment and RLUIPA

To the extent that Ciempa seeks to bring a claim based on the failure to provide him with a Halal diet, he has failed to establish that such failure imposes a substantial burden on his religious exercise. See Abdulhaseeb, 600 F.3d at 1312. Ciempa himself stated that his religious needs could be satisfied by the provision of a Kosher diet. Therefore, defendants are entitled to summary judgment on Ciempa's First Amendment and RLUIPA claims regarding a Halal diet.

b.      Due Process and Equal Protection

Ciempa has failed to identify similarly-situated individuals who received different treatment. He has failed to show that the denial of a Halal diet imposed a significant and atypical hardship. It is a reality of prison life that inmates may not receive diets individually tailored to their particular

beliefs or desires.  Therefore, defendants are entitled to summary judgment on each of Ciempa's claims relating to the denial of his request for a special diet.

6.    Hygienic Items

Ciempa alleges that his First and Fourteenth Amendment and RLUIPA rights have been violated by ODOC's denial of his request to purchase pork-free hygienic products and his request that ODOC approve the NGE's vendor of such products.  Ciempa needs pork-free hygienic products "as a means to preserve his mental power and beauty appearance." Dkt. # 18, at 10.  NGE doctrine prohibits the use of hygienic products containing pork or pork by-products. The DCCC chaplain performed a visual inspection of the hygienic items available in the canteen and concluded that two hair products were the only products that possibly contained pork or pork by-products.  ODOC denied Ciempa's request to approve the NGE vendor.  Ciempa has stated that he "does not want a chemical analysis done on each product," but that he wants ODOC to contact NGE authorities regarding the items for sale in the canteen.  Dkt. # 52, at 4.

a.    First Amendment and RLUIPA

Ciempa has failed to establish that the availability of items in the canteen or ODOC's refusal to contact NGE authorities has substantially burdened his religious exercise.  He has not produced any evidence that items in the canteen contain pork or pork by-products (besides, possibly, the two previously-identified hair products).  Ciempa's mere speculation that items could contain pork by-products is insufficient to create a genuine issue of material fact.  Further, under the First Amendment and RLUIPA, Ciempa must establish that his religious exercise has been burdened; therefore defendants do not have to prove that there are no pork by-products in canteen items.  Cf. Ashann-Ra v. Johnson, No. 7:02-CV-00927, 2003 WL 24056720, at *6-7 (W.D. Va. Aug. 22, 2003)

(granting defendants summary judgment on plaintiff's claim that prison officials failed to research his religious needs regarding hygiene products and noting that plaintiff failed to identify any specific ingredients or products that were objectionable).  In fact, the evidence shows that prison officials attempted to accommodate Ciempa's religious needs by performing a visual inspection of all items sold in the canteen.

Ciempa has similarly failed to show how ODOC's refusal to contact NGE authorities regarding canteen items constitutes a substantial burden on his religious exercise.  Ciempa is free to contact NGE authorities on his own if he is concerned that canteen items are unacceptable.  The First Amendment and RLUIPA do not require prison authorities to actively facilitate Ciempa's religious exercise.   See Abdulhaseeb, 600 F.3d at 1230-31 (noting that RLUIPA requires "governments to refrain from substantially burdening religion, not to affirmatively subsidize religion").  The same is true for the denial of Ciempa's request to approve the NGE vendor.  Ciempa has not alleged that the vendor's products are the only hygienic products he may use.  Therefore, it is not clear how the refusal to approve his vendor burdens his religious exercise.  ODOC authorities have not forced Ciempa to engage in conduct that violates his beliefs, prevented him from engaging in religious exercise, or placed substantial pressure on him to do so.  Ciempa has failed to establish a prima facie case for a First Amendment or RLUIPA violation regarding the canteen items because he has failed to show that his religious exercise has been substantially burdened.  Therefore, defendants are entitled to summary judgment on Ciempa's First Amendment and RLUIPA claims regarding hygienic items.

b.      Due Process

Ciempa argues he was not presented with a meaningful opportunity to dispute the hygienic items issue because ODOC officials refused to contact his religious authorities. Dkt. # 52, at 4. This is not sufficient to state a claim for a due process violation. Ciempa has not shown that ODOC's failure to contact NGE authorities or otherwise prove to him that canteen items are religiously acceptable imposes an atypical and substantial burden. Incarceration necessarily carries with it restrictions on a prisoner's ability to purchase items of his or her choosing. Defendants are entitled to summary judgment on Ciempa's due process claim relating to hygienic items.

c.      Equal Protection

Ciempa asserts that "other religions or religious groups similarly situated are not subject to . . . oppressive and abusive measures" Dkt. # 18, at 11. Again, he provides no evidence to substantiate this claim. Ciempa has failed to identify other similarly situated individuals who received different treatment and has not provided any evidence that ODOC's treatment of his requests was motivated by an improper purpose. Therefore, defendants are entitled to summary judgment on Ciempa's equal protection claim relating to hygienic items.

**B.      Claims not Contained in the Third Amended Complaint**

Ciempa makes additional allegations in motions and briefs filed after his third amended complaint. For example, in Plaintiff's Motion to Reassert His Motion for Preliminary Injunction (Dkt. # 53), Ciempa claims that he "has not received any response from Agency Chaplain Leo Brown concerning his request for ODOC to include in its religious policy the use of oils for NGE adherents, the possession of headgear and neckwear specific to the NGE, and the viewing of DVDs specific to the NGE." Dkt. # 53, at 3. The Court will not consider claims not plead in Ciempa's

43

third amended complaint. Such claims were not within the scope of the <u>Martinez</u> report, and defendants have not been provided adequate notice of such claims. The scope of this suit cannot be a moving target; Ciempa cannot add claims to this suit every time prison officials allegedly violate his rights. He is free to file additional suits regarding incidents not covered in his third amended complaint. To the extent that Ciempa has moved to add additional claims to this suit, such motion is denied.

In summary, defendants are not entitled to summary judgment on Ciempa's RLUIPA claims regarding the denial of <u>Stoic Warriors</u> and his request for chapel time. Defendants are entitled to summary judgment on the remainder of Ciempa's claims. Having narrowed the scope of the claims asserted in this case, the Court will proceed to determine the proper defendants going forward.

## C.    <u>Proper Defendants</u>

The Court will now determine which defendants are proper parties to Ciempa's remaining claims, and in what capacity or capacities they may be sued.

### 1.    <u>Particular Defendants</u>

The defendants responsible for the denial of <u>Stoic Warriors</u> and chapel time are the only proper parties defendants in this suit going forward. Ciempa alleges that McClary, Hood, Jones, Morton, and Harvanek were involved in the prohibition of <u>Stoic Warriors</u>, Dkt. # 18, at 6-7, and that Jones, Morton, and Brown were involved in the denial of his request for chapel time, <u>id.</u> at 8. Defendants Dinwiddie, Blair, Bartley, Cave, Boyett, and Redeagle shall be granted summary judgment because Ciempa has not alleged that they were involved in the incidents giving rise to Ciempa's two remaining claims.

In the § 1983 context, the Tenth Circuit requires that individual liability be based on personal involvement in the alleged constitutional violation. <u>Foote v. Spiegel</u>, 118 F.3d 1416, 1423 -24 (10th Cir. 1997); <u>see also</u> <u>Patel v. United States</u>, No. 97-1083, 1997 WL 764570, at *2  (10th Cir. Dec. 4, 1997) (unpublished)[31] ("plaintiff must demonstrate . . . that each remaining defendant personally participated in the alleged deprivation of his constitutional rights").  There is no supervisory liability under § 1983 absent an "'affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise.'" <u>Gallagher v. Shelton</u>, 587 F.3d 1063, 1069 (10th Cir. 2009) (quoting <u>Green v. Branson</u>, 108 F.3d 1296, 1302 (10th Cir. 1997)).  This logic is also applicable to RLUIPA claims.  <u>Cf.</u> <u>Lovelace</u>, 472 F.3d at 193 (dismissing RLUIPA claim against an assistant warden because it was the warden, not the assistant, who issued the challenged policy).  An otherwise non-culpable person cannot be held liable for his subordinate's violation of RLUIPA merely because of his or her status as a supervisor. Ciempa alleges that McClary seized <u>Stoic Warriors</u> "at the direction and command of . . . Hood, Chief of Security . . . ."  Dkt. # 18, at 6.  There is evidence that McClary was personally involved in the decision to seize and prohibit the book.   However, there is no evidence that Hood was personally involved in the decision to confiscate <u>Stoic Warriors</u>, or that he was even aware that the book had come into DCCC.[32]   Therefore, Hood is entitled to summary judgment on Ciempa's RLUIPA claim regarding the confiscation of <u>Stoic Warriors</u>.

---

[31]    Unpublished decisions are not precedential, but may be cited for their persuasive value.  <u>See</u> Fed. R. App. P. 32.1: 10th Cir. R. 32.1.

[32]    There is evidence that Hood was aware that <u>The U.S. Army Ranger Handbook</u> had come in to DCCC, but defendants are entitled to summary judgment on Ciempa's claims regarding such book.  <u>See</u> Part III.A.3, <u>supra</u>.

Morton's only involvement in the incident was her return of Ciempa's grievance appeal based on failure to follow proper procedures.  In the § 1983 context, the "denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation . . . ."  Gallagher, 587 F.3d at 1069 (discussing plaintiff's argument that the defendant "rubber stamped" his grievances) .  The same is true here.  Morton reviewed two of Ciempa's grievance appeals and denied them for failure to comply with technical or procedural requirements.  Her return of Ciempa's grievance appeal for failure to follow proper procedures does not show substantive involvement in the denial of Stoic Warriors.  Similarly, the only evidence of Harvanek's involvement is that he reviewed Ciempa's GRF and took no action.  There is no evidence that Harvanek had substantive involvement in the confiscation of Stoic Warriors.  Morton and Harvanek are entitled to summary judgment on Ciempa's Stoic Warriors claim.

Jones is not a proper defendant regarding the Stoic Warriors claim because there is no evidence that he was personally involved in, or even aware of, the decision to prohibit the book.  Jones is entitled to summary judgment on Ciempa's Stoic Warriors claim.

Ciempa brings his RLUIPA claim regarding chapel time against Jones, Morton, and Brown.  Just as in the Stoic Warriors incident, Morton's only involvement with the denial of Ciempa's request for chapel time was her denial of Ciempa's grievance appeal for technical reasons.  There is no evidence of her substantive involvement in the decision to deny Ciempa's request or ODOC's position regarding the NGE.  Therefore, Morton is entitled to summary judgment on Ciempa's RLUIPA claim regarding the denial of his chapel time request.  Ciempa's chapel time claim may, however, proceed against Jones and Brown.  Brown made the decision to ban the NGE from the

46

chapel.  As the Director of ODOC, Jones was responsible for the ODOC's policy of not allowing the NGE to use the chapel.[33]

In summary:

- There are no remaining claims against defendants Dinwiddie, Blair, Bartley, Cave, Boyett, and Redeagle, and they are entitled to summary judgment on all claims;

- Defendants Hood, Morton and Harvanek, and Jones are entitled to summary judgment on Ciempa's RLUIPA claim regarding Stoic Warriors;

- Defendant Morton is entitled to summary judgment on Ciempa's RLUIPA claims regarding the denial of his chapel time request;

- The remaining defendant to Ciempa's RLUIPA claim regarding Stoic Warriors is McClary; and

- The remaining defendants to Ciempa's RLUIPA claim regarding chapel time are Jones and Brown.

2.    Claims for Damages

The PLRA prohibits prisoners from bringing federal actions "for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).  In Searles v. Van Bebber, 251 F.3d 869 (10th Cir 2001), the Tenth Circuit held that this limitation on recovery applied to a plaintiff's First Amendment claim that prison officials denied him a Kosher diet.  Id. at 876-77.  The limitation applies to claims for actual or compensatory damages, but not

---

[33]    Because the chapel policy is ODOC policy, the basis for a claim against Jones is premised on more than a mere respondeat superior theory.

nominal[34] or punitive damages. Id. at 879, 881. Ciempa has not alleged any physical injury caused by the alleged deprivations of his RLUIPA rights. Therefore, Ciempa's claims for actual or compensatory damages must be dismissed.

Further, there is no evidence in the record to support an award of punitive damages. In the § 1983 context, punitive damages "'are to be awarded only when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.' The focus must be on whether the defendant's actions call for 'deterrence and punishment over and above that provided by compensatory awards.'" Youren v. Tintic School Dist., 343 F.3d 1296, 1308 (10th Cir. 2003) (quoting Jolivet v. Deland, 966 F.2d 573, 577 (10th Cir. 1992)); see also Patel v. Wooten, 264 Fed. App'x 755, 760 (10th Cir. 2008) (unpublished)[35] (determining, in the First Amendment context, that prison officials' actions did not "rise to the level of evil intent or reckless or callous indifference to sustain a jury award of punitive damages"). If punitive damages were available under RLUIPA,[36] the same standard should govern the availability of such damages. The record is entirely devoid of evidence that the remaining defendants acted with reckless or callous indifference to Ciempa's federally protected rights. The record shows that the remaining defendants reasonably believed that the NGE was a security threat and the denial of Stoic Warriors and the denial of chapel time were necessary for prison safety.

---

[34]    "'Nominal damages are damages in name only, trivial sums such as six cents or $1.' They do not purport to compensate for past wrongs. They are symbolic only." Utah Animal Rights Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1264 (10th Cir. 2004) (quoting 1 DAN B. DOBBS, DOBBS LAW OF REMEDIES § 3.3(2), at 294 (2d ed.1993)).

[35]    Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. P. 32.1: 10th Cir. R. 32.1.

[36]    The Tenth Circuit has not determined whether punitive damages are "appropriate relief" under RLUIPA.

48

There is no evidence that their actions were motivated by animosity towards the NGE or insensitivity to Ciempa's needs. Ciempa's claims for punitive damages fail. Therefore, Ciempa's only remaining potential damages claim is for nominal damages.

3.    Official Capacity Claims

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). However, "official-capacity actions for prospective relief are not treated as actions against the State." Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985); see also Ex Parte Young, 209 U.S. 123 (1908). Therefore, the doctrine of sovereign immunity does not bar Ciempa's claims for prospective relief against defendants in their official capacities.[37]

The Tenth Circuit recently discussed the availability of money damages against official capacity defendants under RLUIPA:

> Several circuit courts have held, under the principles of sovereign (Eleventh Amendment) immunity, that money damages are not available for official-capacity RLUIPA claims. This view is supported by the statement by one of RLUIPA's

---

[37]    Defendants argue that sovereign immunity bars Ciempa's § 1983 claims only and did not discuss sovereign immunity and RLUIPA. Separately, defendants argue (incorrectly) that no claims against individual defendants are available under RLUIPA. Dkt. # 42, at 29. This proposition is not supported by the cases to which defendants cite. See Boles, 402 F. Supp. 2d at 1240 (stating that RLUIPA does not permit claims against individual officers "except perhaps in his or her official capacity"); Smith v. Allen, 502 F.3d 1255, 1276 n.12 (11th Cir. 2007) (holding that state prison institutions waived their sovereign immunity under RLUIPA). Further, although state officials acting in their official capacities are not "persons" under § 1983, Will, 491 U.S. at 71, this is irrelevant because Ciempa has no remaining § 1983 claims. A person acting under color of state law is within RLUIPA's definition of "government." 42 U.S.C. § 2000cc-5. The Tenth Circuit has not determined whether states waive their Eleventh Amendment immunity under RLUIPA by accepting federal funds. Other circuits have reached differing conclusions on the issue.

sponsors in the House of Representatives.  On the other hand, one circuit court has concluded that monetary relief is available against official-capacity defendants in RLUIPA suits (although, the court also acknowledged, for a prisoner plaintiff, the Prisoner Litigation Reform Act generally will limit such relief to nominal damages).

<u>Abdulhaseeb</u>, 600 F.3d at 1311-12 (internal citations omitted).

The <u>Abdulhaseeb</u> court did not ultimately decide the issue because it was not raised on appeal.  Pursuant to the PLRA, only nominal and punitive damages are potentially available, <u>see</u> Part III.C.2, <u>supra</u>. Further, under the circumstances of this case, punitive damages are not available.  <u>Id.</u> The Court will determine if Ciempa is legally and factually entitled to nominal damages against the remaining defendants in their official capacities if summary judgment is not entered on these claims in the future and if Ciempa prevails at trial.

4.      Individual Capacity Claims and Qualified Immunity

Defendants argue that they are entitled to qualified immunity.[38]   Government officials sued in their individual capacities  are immune from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987).  There is a two-part test for qualified immunity. A court must determine whether, "taken in the light most favorable to the party asserting the injury . . . the facts alleged show the offic[ial's] conduct violated a constitutional right,"  and  whether that right was clearly established.  Saucier v. Katz, 533 U.S. 194, 201 (2001) (overruled on other grounds by Pearson v. Callahan, 129 S. Ct. 808 (2009)).  Recently, the Supreme Court has determined that courts may determine whether a right was clearly established before determining if the facts alleged establish the violation of a constitutional right.  Pearson, 129 S. Ct. at 818.

---

[38]      This Court has previously recognized that the weight of authority suggests that RLUIPA does not authorize individual capacity suits at all.  See Hammons v. Jones, No. 00-CV-0143-CVE-SAJ, 2006 WL 353448, at *1 (N.D. Okla. Feb. 14, 2006) (citing Boles, 402 F. Supp. 2d at 1240; Rowe v. Davis, 373 F. Supp. 2s 822, 828 (N.D. Ind. 2005); Guru Nanak Sikh Society of Yuba City v. Sutter, 326 F. Supp. 2d 1128, 1136 (E.D. Cal. 2003); Hale O Kaula Church v. Maui Planning Comm'n, 229 F. Supp. 2d 1056, 1067 (D. Haw. 2002)).  The Eleventh Circuit has held that individual capacity suits are not authorized under RLUIPA because the statute was enacted under Congress's Article I Spending Power and, pursuant to Eleventh Circuit law, "Congress cannot use its Spending Power to subject a non-recipient of federal funds, including a state official acting in his or her individual capacity, to private liability for monetary damages."  Smith v. Allen, 502 F.3d 1255, 1273 (11th Cir. 2007).  The Fourth, Fifth, and Seventh Circuits have reached similar conclusions.  See Nelson v. Miller, 570 F.3d 868, 889 (7th Cir. 2009); Rendelman v. Rouse, 569 F.3d 182, 188-89 (4th Cir. 2009); Sossamon v. Lone Star State of Texas, 560 F.3d 316, 328-29 (5th Cir. 2009); but see Campbell v. Alameida, 295 Fed. App'x 130, 131 (9th Cir. 2008) (affirming the determination that defendants were entitled to qualified immunity, which suggests that the court assumed that individual capacity suits were available).  If individual capacity suits were unavailable under RLUIPA, the qualified immunity issue would be moot.  Because the Court finds that the remaining defendants are entitled to qualified immunity, the result would be the same if individual capacity suits were completely barred.

51

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Therefore, in order to be clearly established, "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202 (quoting Anderson, 483 U.S. at 640). An official cannot be held personally liable for taking action that he or she reasonably - but mistakenly - believes is lawful. See Anderson, 483 U.S. at 641 (discussing reasonable but mistaken determinations of probable cause).

Defendants argue that they are entitled to qualified immunity because it is not clearly established that the NGE is a religion entitled to RLUIPA protection.[39] Dkt. # 42, at 33. The Court need not resolve this issue because the remaining defendants are entitled to qualified immunity on a different basis. It is not clearly established that the denial of a book that prison officials deem to be a security threat and the denial of chapel time to a group that prison officials deem to be a security threat would violate RLUIPA. The evidence shows that the relevant officials believed that the book and meetings would threaten prison security. The Court has determined that such beliefs were reasonable, see Part III.A., supra, and that defendants are entitled to summary judgment on all of Ciempa's First Amendment claims. Defendants were not entitled to summary judgment on some of Ciempa's RLUIPA claims because RLUIPA requires more than a mere reasonableness determination. However, what exactly RLUIPA requires in a case such as this one is far from

---

[39]     This contention is tenuous. It is clearly established that religious exercise is entitled to RLUIPA protection. As discussed in Part III.A, supra, the NGE has many aspects of a religion.

clearly established. There is no evidence that the remaining defendants should have known that their conduct would violate the law.[40]   Therefore, they are entitled to qualified immunity.

## IV.

Ciempa has filed a pleading titled Plaintiff's Motion to Reassert his Motion for Preliminary Injunction (Dkt. # 53).  On July 10, 2009, Ciempa filed a motion for preliminary injunction and/or temporary restraining order (Dkt. # 24).  That motion was denied because Ciempa had not served defendants.  Dkt. # 26, at 3.  To the extent that Ciempa seeks reconsideration of this ruling, he has provided no basis to do so.

Liberally construing Ciempa's pleading, as it must, the Court construes Dkt. # 53 as a second motion for a preliminary injunction.  A preliminary injunction is an "extraordinary equitable remedy designed to 'preserve the relative positions of the parties until a trial on the merits can be held.'" Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1225 (10th Cir. 2009) (quoting Univ. Of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).  To be entitled to a preliminary injunction, the moving party must establish the following:

> (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest.

---

[40]   Further, denying qualified immunity under these circumstances would be contrary to the purposes of the doctrine.  Prison officials, much like police officers, must be reasonably free to make determinations regarding immediate threats to prison safety without fear of subsequent individual liability.  It would be dangerous to adopt a rule encouraging prison officials to err on the side of accommodating questionable RLUIPA claims at the expense of prison safety.

Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001).  As a preliminary matter, the Court must determine whether the plaintiff seeks a "specifically disfavored" type of preliminary injunction.  See Schrier v. Univ. of Colo., 427 F.3d 1253, 1259 (10th Cir. 2005); O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004) (en banc).   The three types of disfavored preliminary injunctions are: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." O Centro, 389 F.3d at 975. If an injunction fits into one of these three categories, it must be "more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." Id.

Ciempa's requested injunction would be mandatory, particularly with respect to the provision of chapel time.  An injunction is mandatory, rather than prohibitory, "if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result  . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" Schrier, 427 F.3d at 1261 (quoting SCFC ILC, Inc v. Visa USA, Inc., 936 F.2d 1096, 1099 (10th Cir. 1991)).  If the Court were to grant Ciempa a preliminary injunction on his surviving claims, it would be required to set the terms of and supervise the provision of space and time in the prison chapel.

Even if the requested injunction were not specifically disfavored, Ciempa would not be entitled to a preliminary injunction because the balance of hardships and public interest tip strongly in defendants' favor in this case.  The Court will not second-guess prison officials' reasonable determinations regarding prison safety without a fully developed record.  The potential risk to prison

54

safety that the requested injunction would create greatly outweighs the risk of harm to Ciempa.  The Court will not enter a preliminary injunction ordering prison officials to act in contravention of their reasonable conclusions regarding prison safety.  Ciempa's motion for a preliminary injunction is denied.

**IT IS THEREFORE ORDERED** that plaintiff's motions to supplement the record (Dkt. ## 56, 57, 58) are **granted**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Reassert His Motion for Preliminary Injunction (Dkt. # 53) is **denied**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss Plaintiff's 42 U.S.C. § 1983 Civil Rights Complaint or Alternatively Motion for Summary Judgment and Brief in Support (Dkt. # 42) is **granted in part** and **denied in part**, as set forth herein.  Summary judgment is granted on all claims except the following claims against the following defendants:

•   A RLUIPA claim for the denial of <u>Stoic Warriors</u> against defendant McClary in his official capacity; such claim is for declaratory and injunctive relief and nominal damages; and

•   A RLUIPA claim for the denial of space and time in the prison chapel against defendants Jones and Brown in their official capacities; such claim is for declaratory and injunctive relief and nominal damages.

**IT IS FURTHER ORDERED** that summary judgment is entered for defendants Dinwiddie, Morton, Blair, Bartley, Harvanek, Hood, Cave, Boyett, and Redeagle, and they are terminated as parties.  Summary judgment is entered on the claims against McClary, Jones, and Brown insofar as those defendants were sued in their individual capacities.

55

**IT IS FURTHER ORDERED** that additional motions for summary judgment may be filed after a reasonable time for additional discovery, but no later than **October 31, 2010.**

**DATED** this 23rd day of August, 2010.

Claire V Eagl

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE